**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

STRATTON PEAY,                           :        Civil No. 3:15-cv-345
                                         :
           Plaintiff                     :        (Judge Mariani)
                                         :
    v.                                   :
                                         :
SUPERINTENDENT J. FISHER, *et al.*,      :
                                         :
           Defendants                    :

## MEMORANDUM

Plaintiff, Stratton Peay, an inmate formerly confined at the Smithfield State

Correctional Institution, ("SCI-Smithfield"), in Huntingdon, Pennsylvania, initiated the instant

action pursuant to 42 U.S.C. § 1983. (Doc. 1). The matter is proceeding *via* an amended

complaint wherein Peay names the following Defendants at SCI-Smithfield: Jon Fisher,

Lonnie Oliver, Jay Whitesel, Nathan Goss, Kenneth Crum, and William Henry. (Doc. 17).

Presently pending before the Court is Defendants' motion for summary judgment pursuant

to Federal Rule of Civil Procedure 56. (Doc. 105). For the reasons set forth below, the

Court will grant the motion for summary judgment.

## I.    Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

2

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## II.    **Statement of Undisputed Facts**[1]

The allegations of the amended complaint pertain to Peay's incarceration at SCI-

Smithfield. (Doc. 106, Statement of Material Facts, ¶ 1).

---

[1]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil
Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered
paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF
COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material
facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying
genuine issues for trial. *See id.* Unless otherwise noted, the factual background herein derives from
Defendants' Rule 56.1 statement of material facts. (*See* Doc. 106). Peay did not file a response to
Defendants' statement of material facts. The Court accordingly deems the facts set forth by Defendants to
be undisputed. *See* LOCAL RULE OF COURT 56.1.

To the extent that Peay's responses to the summary judgment motion attempt to challenge his
underlying criminal conviction, he cannot use this civil proceeding to contest his conviction and profess his
actual innocence. *See* (Docs. 110, 116, 141, 142). The Court previously advised Peay that he must
refrain from challenging his criminal conviction in this proceeding. (*See* Docs. 124, 126, 132).

3

Peay alleges that Defendants Fisher, Whitesel, Oliver, and Goss failed to protect him after he notified them that staff were "'torturing' [him], 'siccing' inmates on [him] to verbally abuse [him] and start 'fist-fights' with [him]" in an "attempt to keep [him] 'quiet' regarding [] being 'framed' for crimes." (Doc. 106, ¶ 9; Doc. 17, pp. 2-3).

Peay sets forth First Amendment retaliation claims against unnamed staff who allegedly tampered, read, and withheld his mail in retaliation for Peay's assertion that he is innocent of murder. (Doc. 106, ¶ 10; Doc. 17, p. 3).

Peay asserts that all of the Defendants knew of and acquiesced in Peay's assault by inmates Wilson and Reyes, the stealing of Peay's Nike sneakers and box of oatmeal from his cell, and his food being poisoned with herpes. (Doc. 106, ¶ 11; Doc. 17, p. 4). Peay claims that these acts were committed for "raising [his] 'Actual Innocence' and staff's malfeasance." (*Id*.). Peay claims that unnamed staff poisoned him "after raising staff's involvement in the 4-29-14 assault." (Doc. 106, ¶ 12; Doc. 17, p. 4). He alleges that Defendant Goss illegally confiscated and kept his Walkman radio "after raising staff's involvement in the 4-29-14 assault." (Doc. 106, ¶ 13; Doc. 17, p. 4). Peay further claims that Defendant Henry failed to protect him from being poisoned with herpes when he was "in charge of the housing unit and [knew] beforehand, if not participating himself." (Doc. 106, ¶ 14; Doc. 17, p. 5).

Peay claims that "Defendants all are liable for violating policy, or having none,

4

regarding 'cleaning' of cells once exited and prior to the next inmate being housed there."
(Doc. 106, ¶ 15; Doc. 17, p. 5).

Peay claims that Defendants Fisher, Whitesel, and Oliver refused to remove Peay's
Z code status "so they could continue to cause [him] 'harm' (claustrophobia; etc.) from the '6
½ years' [he] served in 'solitary confinement.'" (Doc. 106, ¶ 16; Doc. 17, p. 5).

He further claims that Defendants found Peay guilty of fighting "although ¾ C.O.s
witnessed me assaulted by 2 inmates." (Doc. 106, ¶ 17; Doc. 17, p. 5).

For relief, Peay seeks monetary damages, punitive damages, a temporary
restraining order against Defendants and the Department of Corrections ("DOC") restraining
them from tampering, reading, and withholding his legal mail and obstructing his access to
courts, removal of his Z code status, an interstate transfer, all misconducts and negative
reports removed from his record, and an injunction preventing staff from "hurting" and
"obstructing court, my mail, etc." (Doc. 106, ¶ 18; Doc. 17, p. 6).

## A.     Peay's Altercation with Inmates Reyes and Wilson

On April 29, 2014, Peay fought with inmates Reyes and Wilson. (Doc. 106, ¶ 19).
On the same date, following the altercation, Peay told RHU staff during a strip search that
correctional officers instigated the assault on him. (Doc. 106, ¶ 21).

Also on April 29, 2014, correctional officer Peters issued Misconduct Number
B357021 charging Peay with Fighting due to his altercation with inmates Reyes and Wilson,

5

and Refusing to Obey an Order for ignoring several orders to stop. (Doc. 106, ¶ 20). On May 5, 2014, Hearing Examiner Himes held a hearing on Misconduct Number B357021. (Doc. 106, ¶ 25; Doc. 106-1, p. 10). Hearing Examiner Himes ultimately found Peay guilty of Fighting and Refusing to Obey an Order. (*Id.*). Peay appealed Misconduct Number B357021 to the Program Review Committee. (Doc. 106, ¶ 26). The Program Review Committee denied Peay's appeal and found that the facts were sufficient to support the underlying decision. (*Id.*). The Program Review Committee consisted of Defendant Whitesel, Corrections Classification Program Manager Biser, and Unit Manager Morder. (Doc. 106, ¶ 27). On May 14, 2014, Peay appealed to Defendant Fisher. (Doc. 106, ¶ 29). On May 19, 2014, Defendant Fisher upheld the decisions of the Hearing Examiner and Program Review Committee. (Doc. 106, ¶ 30; Doc. 106-1, p. 13). Peay then appealed Misconduct Number B357021 to Final Review. (Doc. 106, ¶ 35). On June 20, 2014, the DOC Deputy Secretary vacated Misconduct Number B357021and remanded it to permit recharge and rehearing. (*Id.*; Doc. 106-1, p. 14).

On April 29, 2014, Peay filed Grievance Number 507592 claiming that staff failed to protect him. (Doc. 106, ¶ 22; Doc. 106-1, p. 16). In the grievance, Peay stated that he contacted staff, including the Superintendent, Deputies, and Captain of Security, concerning correctional officers committing crimes, torture, and oppression against him in attempts to silence him about a detective framing him for murder. (*Id.*). Peay further complained that

6

correctional officers retaliated against him and had two inmates physically assault him on April 29, 2014. (Id.). On May 8, 2014, Lieutenant G. Allison denied Grievance Number 507592 because Peay failed to provide evidence supporting his allegations, and the inmates and staff involved in the altercation denied Peay's allegations. (Doc. 106, ¶ 28; Doc. 106-1, p. 17). On May 14, 2014, Peay appealed Grievance Number 507592 to Defendant Fisher. (Doc. 106, ¶ 29; Doc. 106-1, p. 18). On May 19, 2014, Defendant Fisher upheld the denial of Grievance Number 507592. (Doc. 106, ¶ 31; Doc. 106-1, p. 19). Peay then appealed Grievance Number 507592 to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Doc. 106, ¶ 32; Doc. 106-1, p. 20). On June 23, 2014, Chief Grievance Officer Dorina Varner upheld the denial of Grievance Number 507592. (Doc. 106, ¶ 36; Doc. 106-1, p. 21).

Peay called the abuse hotline regarding his allegation that correctional officers had two inmates assault him. (Doc. 106, ¶ 23). In response to Peay's call to the abuse hotline, Captain Goss and Lieutenant Booher interviewed Peay on April 30, 2014. (Doc. 106, ¶ 24). Peay told Captain Goss and Lieutenant Booher that he believed Defendant Crum had the inmates assault him. (Id.). Peay could not provide any evidence to support his belief. (Id.). Instead, he stated that it was "just what [he] thought" happened and he "really [did] not know." (Id.; Doc. 106-1, p. 17).

On May 20, 2014, Peay filed Grievance Number 510472 claiming that his counselor,

Mr. Zimmerman, falsely accused him of misconduct and that staff had him physically assaulted by two inmates on April 29, 2014. (Doc. 106, ¶ 33; Doc. 106-1, p. 23). On May 29, 2014, Defendant Oliver denied Grievance Number 510472. (Doc. 106, ¶ 34; Doc. 106-1, p. 24). Peay appealed Grievance Number 510472 to Defendant Fisher. (Doc. 106, ¶ 38). On June 25, 2014, Defendant Fisher upheld the denial of Grievance Number 510472. (*Id.*; Doc. 106-1, p. 25). Peay filed no further appeals of Grievance Number 510472. (Doc. 106, ¶ 38).

On June 23, 2014, Peay sent a letter to the Huntingdon County District Attorney raising several claims against prison staff, including claims that white staff had him assaulted by inmates Reyes and Wilson on April 29, 2014. (Doc. 106, ¶ 37; Doc. 106-2, pp. 6-7). On July 7, 2014, the Huntingdon County District Attorney forwarded Peay's correspondence to the Department of Corrections. (Doc. 106, ¶ 39; Doc. 106-2, p. 10). The Department of Corrections initiated an Office of Special Investigations and Intelligence ("OSII") Investigation regarding Peay's allegations. (Doc. 106, ¶ 40). SCI-Smithfield Security Lieutenant G. Allison conducted the investigation and determined that Peay's allegations were unsubstantiated. (Doc. 106, ¶¶ 41-42; Doc. 106-2, pp. 2-4, Declaration of Gary Allison, ¶¶ 5-6). During the investigation, the staff and inmates who were involved in the April 29, 2014 altercation between Peay and inmates Reyes and Wilson were interviewed. (Doc. 106, ¶ 43). They all denied Peay's allegations. (*Id.*). Inmates Reyes

and Wilson stated that Peay had been coming at them on the block for a month, they had enough, and beat him up. (Doc. 106, ¶ 44). When interviewed, Peay stated that he could not provide any evidence to support his claim that staff had inmates Reyes and Wilson assault him. (Doc. 106, ¶ 45). Instead, Peay stated that is what he thinks happened. (Id.). On October 20, 2014, the OSII reviewed the investigation and determined that it was satisfactory. (Doc. 106, ¶ 46). On October 21, 2014, Security Lieutenant G. Allison notified Peay that the investigation was being closed because there was no evidence of abuse. (Doc. 106, ¶ 47).

## B. Exhaustion of Administrative Review

On January 10, 2014, Peay filed Grievance Number 493085 claiming that four envelopes and eight stamped envelopes were taken from his cell. (Doc. 106, ¶ 48; Doc. 106-1, p. 27). No Defendants were named in Grievance Number 493085. (Id.). The grievance was upheld and Peay was provided replacement envelopes. (Doc. 106, ¶ 48; Doc. 106-1, p. 28).

On January 15, 2014, Peay filed Grievance Number 493773 claiming that his radio and Walkman were confiscated during an investigative search. (Doc. 106, ¶ 49; Doc. 106-1, p. 30). Defendant Goss was the only Defendant named in Grievance Number 493773. (Id.). Grievance Number 493773 was denied, and Peay did not file any appeals. (Id.).

On May 4, 2014, Peay filed Grievance Number 508389 complaining about a missing

9

pair of Nike sneakers. (Doc. 106, ¶ 50). No Defendants were named in this grievance. (*Id.*). The Grievance Coordinator and Facility Manager each denied Grievance Number 508389. (*Id.*). Peay filed no further appeals. (*Id.*).

On May 10, 2014, Peay filed Grievance Number 509077. (Doc. 106, ¶ 51). In this grievance, Peay claimed that he sustained burning sores on his penis after it touched the inside of a toilet. (*Id.*). Peay did not name any Defendants in Grievance Number 509077. (*Id.*). The grievance was denied. (Doc. 106, ¶ 52). On May 28, 2014, Peay appealed the denial of Grievance Number 509077 to Superintendent Fisher. (*Id.*). In his appeal, Peay raised for the first time a claim that "staff (C.O.s, etc.) may have placed 'Herpes' in my food/ on my toilet." (*Id.*). Peay further stated that "[i]t's been over '17' years since the last time I had sex of any kind." (*Id.*).

On May 28, 2014, Peay filed two grievances regarding sores on his genitals and a possible diagnosis of herpes, assigned as Grievance Number 511544 and Grievance Number 511546. (Doc. 106, ¶ 53). No Defendants were named in either grievance. (*Id.*; Doc. 106-1, pp. 49, 51, 56). The grievances were denied on initial review. (Doc. 106-1, pp. 52, 57). Peay appealed both grievances to the Facility Manager Defendant Fisher. (Doc. 106-1, pp. 53, 58). On appeal, Defendant Fisher upheld the responses of the Grievance Coordinators. (Doc. 106-1, pp. 54, 59). Peay did not appeal either grievance to the SOIGA. (Doc. 106, ¶ 53).

10

On June 5, 2014, Peay filed Grievance Number 513171 regarding mail that was returned by the mail room for lack of postage. (Doc. 106, ¶ 54). No Defendants were named in this grievance. (*Id.*). Grievance Number 513171 was denied on initial review, and Peay did not file any appeals. (*Id.*).

On June 11, 2014, correctional officer Scott issued Misconduct Number B600994 charging Peay with Assault, Abusive, Obscene Language to an Employee and Refusing to Obey an Order. (Doc. 106, ¶ 55; Doc. 106-1, p. 64). Following a hearing, Peay was found guilty of Assault and Refusing to Obey an Order. (Doc. 106-1, p. 66).

On June 14, 2014, Peay filed Grievance Number 514295 wherein he alleged that correctional officer Scott withheld his mail and improperly opened his mail. (Doc. 106, ¶ 56; Doc. 106-1, p. 68). No Defendants were named in Grievance Number 514295. (*Id.*). The grievance was denied by both the Grievance Coordinator and Facility Manager. (Doc. 106, ¶ 56; Doc. 106-1, pp. 69, 71). Peay did not appeal to the SOIGA. (Doc. 106, ¶ 56).

On June 22, 2014, Peay filed Grievance Number 515115 and attempted to collaterally appeal Misconduct Number B600994. (Doc. 106, ¶ 57; Doc. 106-1, p. 73). No Defendants were named in Grievance Number 515115. (*Id.*). The grievance was denied by both the Grievance Coordinator and Facility Manager. (Doc. 106, ¶ 57; Doc. 106-1, pp. 74, 76). Peay did not appeal to the SOIGA. (Doc. 106, ¶ 57).

Peay did not file a grievance complaining that a box of oatmeal was stolen from his

cell at SCI-Smithfield, and he did not file a grievance pertaining to the cleaning of cells at SCI-Smithfield. (Doc. 106, ¶¶ 58-59).

## C.    Herpes Simplex Virus

On June 17, 2014, Peay was tested for the herpes simplex virus. (Doc. 106, ¶ 61; Doc. 106-5, p. 14). The test was conducted by Garcia Laboratory of Jackson, Michigan. (Id.). The test results were negative for the herpes simplex virus. (Doc. 106, ¶ 62; Doc. 106-5, p. 14). Peay's medical records contain no documentation of a positive diagnosis of the herpes simplex virus. (Doc. 106, ¶ 63; Doc. 106-4, p. 3, ¶ 7; Doc. 106-5, p. 3, ¶ 4).

## D.    Z Code Status

A Z code indicates that an inmate requires single-cell status and may not be assigned cell-mates. (Doc. 106, ¶ 64). A Z code may be assigned to inmates who have "a documented history of aggressive or predatory behavior towards cell partners, or staff has reason to believe would exhibit assaultive or predatory behavior towards cell partners." (Doc. 106, ¶ 65; Doc. 106-1, p. 80). "[A]n inmate may request to be reviewed for the addition or deletion of a 'Z' Code housing classification. Staff shall make the final determination regarding Program Code 'Z' addition or removal." (Doc. 106, ¶ 66; Doc. 106-1, p. 80). To determine whether a Program Code "Z" should be added or removed, "a DC-46, Vote Sheet along with other relevant information shall be circulated to the Facility Manager/designee who shall make the final decision." (Doc. 106, ¶ 67; Doc. 106-1, p. 80).

12

"An inmate assigned a Program Code 'Z' due to an inability to double cell is not necessarily precluded from open dormitory housing if staff believe the inmate or others will not be jeopardized as the result of the dormitory housing placement." (Doc. 106, ¶ 68; Doc. 106-1, p. 80).

On March 6, 2014, Counselor Zimmerman prepared a DC-46 Vote Sheet in response to Peay's request to Unit Manager Kustenbauder to have his Z code removed. (Doc. 106, ¶ 69). Peay made this request due to being claustrophobic and because he no longer wanted to be in a cell by himself. (Doc. 106, ¶ 70). Zimmerman reviewed Peay's file and drafted staff recommendations. (Doc. 106, ¶ 71). Zimmerman obtained the following information from Peay's file: Peay has had a Z code since 2001 due to problems with his cellmates while housed at SCI-Graterford; Peay arrived at SCI-Smithfield on December 5, 2013 from SCI-Fayette as an Administrative Separation transfer due to his assault of another inmate; Peay has a significant misconduct history since his reception into the DOC; as of March 6, 2014, Peay had received 64 misconduct reports; as of March 6, 2014, Peay had received multiple misconduct reports for Assault involving staff members; Peay has assaulted staff by punching, kicking, and spitting on them, throwing objects and unknown liquids at them, attempting to bite them, and by making other physical contact with them; as of March 6, 2014, Peay had assaulted other inmates. (Doc. 106, ¶ 71).

All of the voting staff members voted to maintain Peay's Z code status, noting that

Peay was "highly assaultive." (Doc. 106, ¶ 72). Defendants Goss, Whitesel, and Oliver were among the voting staff members. (Doc. 106, ¶ 73). Defendants Crum and Henry did not participate in the vote. (Id.). Defendant Fisher signed the Vote Sheet, making the final decision to maintain Peay's Z code. (Doc. 106, ¶ 74).

Peay has received four misconducts for assaults on other inmates: Misconduct Number B544611 on September 16, 2013; Misconduct Number B310928 on March 22, 2013; Misconduct Number A781193 on May 7, 2007; and, Misconduct Number 0899303 on October 23, 1998. (Doc. 106, ¶ 75). While housed at SCI-Smithfield, Peay's Z code was maintained due to his history of assaultive behavior. (Doc. 106, ¶ 76).

On March 17, 2014, Peay filed Grievance Number 502305 requesting removal of his Z code status. (Doc. 106, ¶ 77; Doc. 106-1, p. 83). The grievance was denied by the Grievance Coordinator and Facility Manager. (Doc. 106-1, pp. 84, 86). Peay appealed to final review, where it was denied by the Chief Grievance Officer. (Doc. 106-1, pp. 87-88).

On April 15, 2014, Peay filed Grievance Number 505979 again requesting removal of his Z code status. (Doc. 106, ¶ 78; Doc. 106-1, p. 90). Grievance Number 505979 was denied on initial review. (Doc. 106, ¶ 78; Doc. 106-1, p. 91). Peay did not file any appeals of Grievance Number 505979. (Doc. 106, ¶ 78).

### E.    Peay's Housing Status at SCI-Smithfield

Administrative Custody ("AC") is a status of confinement for nondisciplinary reasons.

14

(Doc. 106, ¶ 79). AC provides closer supervision, control, and protection than what is provided in general population. (*Id.*). Disciplinary Custody ("DC") is a status of confinement for inmates who have been found guilty of a misconduct in accordance with Department Policy DC-ADM 801, "Inmate Discipline." (Doc. 106, ¶ 80).

From September 2012 to October 2014, inmates on AC or DC status were typically housed in the Restricted Housing Unit ("RHU"). (Doc. 106, ¶ 81). An inmate with a Z code may be housed in General Population or the RHU, and on AC or DC status. (Doc. 106, ¶ 82).

The Pennsylvania Department of Corrections does not house inmates in "solitary confinement." (Doc. 106, ¶ 83).

Peay was housed at SCI-Smithfield from December 5, 2013 to July 10, 2014. (Doc. 106, ¶ 84). From December 5, 2013 to December 12, 2013, Peay was housed in the RHU. (*Id.*). From December 12, 2013 to January 5, 2014, Peay was housed in General Population. (*Id.*). From January 5, 2014 to January 22, 2014, Peay was housed in the RHU. (*Id.*). From January 22, 2014 to April 29, 2014, Peay was housed in General Population. (*Id.*). From April 29, 2014 to July 10, 2014, Peay was again housed in the RHU. (*Id.*).

Peay arrived at SCI-Smithfield on AC status due to his receipt of Other Report Number B640153 on October 15, 2013 for assaulting another inmate. (Doc. 106, ¶ 85).

15

According to Other Report Number B640153, Peay was a danger to himself or others. (*Id.*).

As a result of the PRC's Decision and Rationale from its December 12, 2013 review of Peay, he was released to General Population. (Doc. 106, ¶ 86).

On January 5, 2014, Peay received Other Report Number B600651 which placed him on AC status because "[t]he inmate has been charged with, or is under investigation for a violation of facility rules and there is a need for increased control pending disposition of charges or completion of the investigation." (Doc. 106, ¶ 87; Doc. 106-1, p. 127). As a result of this Other Report, Peay was placed on AC status in the RHU pursuant to DC-ADM 802. (*Id.*).

On January 16, 2015, Peay received Other Report Number B431735 which "request[ed] continued placement on AC status upon release from investigation, effective 1.16.14, due to institutional operational need (appropriate bed space)." (Doc. 106, ¶ 88; Doc. 106-1, p. 129). As a result of this Other Report, Peay was placed on AC status in the RHU pursuant to DC-ADM 802. (*Id.*). On January 22, 2014, Peay was released from AC status to General Population. (Doc. 106, ¶ 89).

On February 21, 2014, Peay received Misconduct Report Number B358382. (Doc. 106, ¶ 90; Doc. 106-1, pp. 133-34). Peay was found guilty of Refusing to Obey and Order, Possession of Contraband, and Loaning or Borrowing Property. (Doc. 106-1, p. 133). He was sanctioned to thirty days cell restriction, effective February 24, 2014. (Doc. 106, ¶ 90;

16

Doc. 106-1, p. 134).

On April 29, 2014, Peay received Misconduct Report Number B357021 due to an altercation with two inmates. (Doc. 106, ¶ 91). As a result of this misconduct, Peay was placed in the RHU. (Id.). He was found guilty of the charges and sanctioned with a total of thirty days Disciplinary Custody status, effective April 29, 2014. (Id.).

On May 28, 2014, Peay received Other Report Number B433782 which stated that "[t]he inmate is in danger by/from some person(s) in the facility and cannot be protected by alternate measures," and requests "[p]lacement on AC status ... upon completion of current DC sanction on 5.28.14 in order to pursue an [Administrative Separation] transfer from SCI-Smithfield." (Doc. 106, ¶ 92; Doc. 106-1, p. 138). As a result of this Other Report, Peay was placed on AC status in the RHU pursuant to DC-ADM 802. (Id.).

On May 29, 2014, the Program Review Committee conducted an administrative hearing as a result of Peay's receipt of Other Report Number B433782. (Doc. 106, ¶ 93). The Program Review Committee authorized continued placement of Peay on AC status. (Id.).

On June 18, 2014, Peay received Other Report Number B684008 which stated that "the inmate is in danger by/from some persons in the facility and cannot be protected by alternate measures," and "[r]equest[s] placement on AC status." (Doc. 106, ¶ 94; Doc. 106-1, p. 142). As a result of this Other Report, Peay was placed on AC status in the RHU

17

pursuant to DC ADM-802. (Id.).

On June 26, 2014, the Program Review Committee conducted an administrative hearing as a result of Peay's receipt of Other Report Number B684008. (Doc. 106, ¶ 95). The Program Review Committee authorized continued placement of Peay on AC status. (Id.).

## III.   Discussion

Defendants seek an entry of summary judgment on the following grounds: (1) Peay failed to establish that he was poisoned with the herpes simplex virus; (2) Peay failed to properly exhaust the administrative remedies with respect to his claims regarding the cleaning of cells, his oatmeal, Walkman, Nike sneakers, and legal mail, the alleged herpes poisoning, any claims against Defendants Fisher, Whitesel, Oliver, Goss, and Henry, and the failure to protect claims; (3) Defendants had no personal involvement in the alleged herpes poisoning, the First Amendment claim, the April 29, 2014 assault, and finding Peay guilty of a misconduct for fighting; (4) Peay failed to establish a failure to protect claim; (5) Peay's Z code status was justified; (6) Peay failed to establish a retaliation claim; and, (7) Defendants are entitled to qualified immunity. (Doc. 112). The Court will address these claims seriatim.

### A.   Herpes Simplex Virus

The uncontroverted evidence establishes that Peay does not have herpes. (Doc.

18

106, ¶¶ 62-63). On June 17, 2014, Peay was tested for the herpes simplex virus. (*Id.* at ¶ 61; Doc. 106-5, p. 14). The results of the test were negative. (Doc. 106, ¶ 62; Doc. 106-5, p. 14). Peay has produced no medical records documenting a positive diagnosis of the herpes simplex virus. Based on the undisputed medical records, the Court finds that there is no genuine issue of material fact as to whether Peay was ever diagnosed with herpes or poisoned with herpes. Consequently, Defendants are entitled to an entry of judgment in their favor on Peay's claim that he was poisoned with herpes and that Defendant Henry failed to protect him from being poisoned with herpes.

## B.    Exhaustion of Administrative Review

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). The exhaustion requirement is mandatory, *see Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Courts have also imposed a procedural default component on the exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004). Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court. *See Spruill*, 372 F.3d 218. "As for the failure to identify named defendants on the grievance form,...to the extent the identity of a defendant was 'a fact relevant to the claim,' Pennsylvania's prison grievance policy mandated that the identification be included in the inmate's statement of facts on the grievance form. And,...in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constituted a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pennsylvania Dep't of Corr.*, 146 F. App'x 554, 557 (3d Cir. 2005) (non-precedential). An "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). Thus, the PLRA mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Id.* at 92.

The Pennsylvania Department of Corrections has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. *See* 37 PA. CODE § 93.9(a); PA. DEP'T OF CORR., No. DC-ADM 804; (*see*

*also* Doc. 106-3, pp. 44-66). After an attempt to resolve any problems informally, an inmate

may submit a written grievance to the Facility's Grievance Coordinator for initial review.

This must occur within fifteen days after the events upon which the claims are based.

Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may

then appeal to the Facility Manager of the institution. Thereafter, within fifteen days of an

adverse decision by the Facility Manager, an inmate may file a final appeal to the

Secretary's Office of Inmate Grievances and Appeals. *See Booth v. Churner*, 206 F.3d 289,

293 n. 2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process). An appeal to

final review cannot be completed unless an inmate complies with all established

procedures. An inmate must exhaust all three levels of review and comply with all

procedural requirements of the grievance review process in order to fully exhaust an issue.

*See Booth*, 206 F.3d at 293 n. 2 (outlining Pennsylvania's grievance review process);

*Ingram v. SCI Camp Hill*, 448 F. App'x 275, 279 (3d Cir. 2011) (same).

### 1. *Cleaning of Cells and Oatmeal Claims*

The undisputed evidence reveals that Peay did not file any grievances related to his

claim that a box of oatmeal was stolen from his cell, and his claim regarding the cleaning of

cells at SCI-Smithfield. (Doc. 106, ¶¶ 58-59; Doc. 106-1, p. 3, ¶ 5). A declaration under

penalty of perjury submitted by Lisa Reeher, Superintendent's Assistant at SCI-Smithfield,

states that based on a review of the DOC's inmate grievances, Peay never filed any

grievances alleging that a box of oatmeal was stolen from his cell, and never filed any grievances complaining about the cleaning of cells at SCI-Smithfield. (Doc. 106-1, pp. 2-6, Declaration of Lisa Reeher, ¶¶ 1, 5). Peay failed to dispute this fact and failed to provide any evidence that he filed any grievances related to these claims. Accordingly, the Court concludes that Peay failed to exhaust administrative remedies with respect to these claims.

### 2. *Walkman, Nike Sneakers, and Handling of Legal Mail Claims*

Defendants argue that Peay never filed a final appeal with the SOIGA regarding the claims that his Walkman was confiscated, his Nike sneakers were missing, and his legal mail was mishandled. (Doc. 112, pp. 14-15).

On January 15, 2014, Peay filed Grievance Number 493773 complaining that his radio and Walkman were confiscated during an investigative search. (Doc. 106-1, p. 30). The grievance states that Defendant Goss informed Peay that his items would not be returned. (*Id.*). The grievance was denied on initial review. (Doc. 106-1, p. 31). Peay did not file any appeals. (Doc. 106, ¶ 49).

On May 4, 2014, Peay filed Grievance Number 508389 complaining about a missing pair of Nike sneakers. (Doc. 106-1, p. 33). No Defendants were named in this grievance. (*Id.*). The Grievance Coordinator and Facility Manager each denied the grievance. (Doc. 106-1, pp. 34-36). Peay did not file any further appeals. (Doc. 106, ¶ 50).

Peay filed the following five grievances regarding the alleged improper handling of his mail at SCI-Smithfield. On January 10, 2014, Peay filed Grievance Number 493085 claiming that four envelopes and eight stamped envelopes were taken from his cell. (Doc. 106, ¶ 48; Doc. 106-1, p. 27). Peay's grievance was upheld and he received replacement envelopes. (Doc. 106, ¶ 48; Doc. 106-1, p. 28). Peay did not appeal Grievance Number 493085. (Doc. 106, ¶ 48).

On June 5, 2014, Peay filed Grievance Number 513171 regarding mail which was returned by the mail room for lack of postage. (Doc. 106, ¶ 54; Doc. 106-1, p. 61). The grievance was denied, and Peay did not file any appeals. (Id.).

On June 14, 2014, Peay filed Grievance Number 514295 complaining that correctional officer Scott withheld his mail and improperly opened his mail. (Doc. 106, ¶ 56; Doc. 106-1, p. 68). No Defendants were named in this grievance. (Doc. 106-1, p. 68). The Grievance Coordinator and Facility Manager each denied Peay's appeals. (Doc. 106, ¶ 56; Doc. 106-1, pp. 69, 71). Peay did not appeal this grievance to the SOIGA. (Id.).

On June 22, 2014, Peay filed Grievance Number 515115 in an attempt to collaterally appeal Misconduct Number B600994. (Doc. 106, ¶ 57; Doc. 106-1, p. 73). Peay complained that correctional officer Scott tampered with his mail. (Doc. 106-1, p. 73). No Defendants were named in this grievance. (Id.). The Grievance Coordinator and Facility

23

Manager each denied Peay's appeals. (Doc. 106, ¶ 57; Doc. 106-1, pp. 74, 76). Peay did not appeal to the SOIGA. (Doc. 106, ¶ 57).

The uncontroverted evidence establishes that Peay has not followed the proper grievance procedure with respect to his claims that his Walkman was confiscated, his Nike sneakers were missing, and his legal mail was mishandled. Peay provides no evidence that he properly grieved these claims. Nor has Peay offered a "justifiable excuse" for failing to do so. *See Williams*, 146 F. App'x at 557. Since Peay failed to comply with the DOC's procedural rules with respect to these claims, Defendants are entitled to an entry of summary judgment on the basis of non-exhaustion.

Moreover, Peay failed to name any Defendants in his grievances regarding the missing Nike sneakers, and the handling of his legal mail. As noted *supra*, the standard used to determine when a prisoner has exhausted the administrative process is whether he complied with applicable grievance procedures and rules. The relevant policy and the pertinent language states as follows:

> The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim. The statement of facts shall include the date, approximate time and location of the event(s) that gave rise to the grievance. The inmate shall identify individuals directly involved in the event(s).

DC-ADM 804, § 1(A)(11). Notably, "[t]he inmate shall identify individuals directly involved in the event(s)." DC-ADM 804, § 1(A)(11). The purpose of the regulation "is to put the prison

24

officials on notice of the persons claimed to be guilty of wrongdoing." *Spruill*, 372 F.3d at

234. Based upon the submitted DOC administrative remedy records, the Court finds that

Peay failed to utilize the DOC's Inmate Grievance System with respect to the grievances

regarding his Nike sneakers, and the handling of his legal mail by failing to identify any

Defendants in these grievances.

### 3. *April 29, 2014 Altercation*

On April 29, 2014, Peay filed Grievance Number 507592 regarding the April 29,

2014 altercation with inmates Reyes and Wilson. (Doc. 106, 19; Doc. 106-1, p. 16). The

grievance only names Defendant Crum, and does not name Defendants Fisher, Whitesel,

Oliver, Goss, and Henry. (*Id.*). The grievance plainly provides that these Defendants were

not named in relation to this claim, and Peay has offered no explanation for the failure to

name these Defendants. The undisputed evidence establishes that Peay has not properly

followed the grievance procedure with respect to any claim that Defendants Fisher,

Whitesel, Oliver, Goss, and Henry caused the alleged assault on April 29, 2014 by failing to

name them in Grievance Number 507592. *See* DC-ADM 804, § 1(A)(11) ("[t]he inmate

shall identify individuals directly involved in the event(s)"). As a consequence, the Court

finds that Peay has failed to exhaust this claim against Defendants Fisher, Whitesel, Oliver,

Goss, and Henry.

### 4. *Herpes Claim*

25

The evidence reveals that Peay filed three grievances complaining about the herpes simplex virus. On May 10, 2014, Peay filed Grievance Number 509077 wherein he claimed that his genitals touched the inside of an unsanitary toilet, causing burning sores. (Doc. 106, ¶ 51; Doc. 106-1, p. 38). Peay requested treatment by the medical department. (*Id.*). Peay did not claim that staff poisoned him with herpes, and did not name any of the Defendants in the grievance. (*Id.*). On May 28, 2014, Peay appealed Grievance Number 509077 to Superintendent Fisher and, for the first time, stated that "staff [C.O.s, etc.] may have placed 'Herpes' in my food/on my toilet." (Doc. 106, ¶ 52; Doc. 106-1, p. 41). Pursuant to DC-ADM 804, "only an issue that was raised for Initial Review, determination of frivolousness, rejection and/or placement on grievance restriction may be appealed." DC-ADM 804, § 2.A.1.c. Peay's grievance plainly shows that he never raised issues pertaining to herpes poisoning on initial review, but only complained of this action in a subsequent appeal to the Superintendent. Hence, Peay has failed to properly exhaust his claim that "staff . . . placed 'Herpes' in my food/on my toilet." (Doc. 106-1, p. 41).

On May 28, 2014, Peay filed two grievances, Grievance Numbers 511544 and 511546, complaining about sores on his genitals and claiming that he may have been poisoned with herpes. (Doc. 106, ¶ 53; Doc. 106-1, pp. 49, 51, 55). Peay did not name any Defendants in these grievances. (*Id.*). The grievances were denied on initial review. (Doc. 106-1, pp. 52, 57). Peay appealed both grievances to Defendant Fisher. (Doc. 106-1, pp.

26

53, 58). On appeal, Defendant Fisher upheld the responses of the Grievance Coordinators. (Doc. 106-1, pp. 54, 59). Peay did not appeal either grievance to the SOIGA. (Doc. 106, ¶ 53). The uncontroverted evidence reflects that Peay has not followed the proper grievance procedure with respect to the claims raised in Grievance Numbers 511544 and 511546.

### 5. *Failure to Protect Claim*

Peay alleges that Defendants Fisher, Whitesel, Oliver, and Goss failed to protect him after being notified that staff were "'torturing' [him], 'siccing' inmates on [him] to verbally abuse [him] and start 'fist-fights' with [him]" in an "attempt[] to keep [him] 'quiet' regarding [] being 'framed' for crimes." (Doc. 17, pp. 2-3). On April 29, 2014, Peay filed Grievance Number 507592 claiming that staff failed to protect him. (Doc. 106-1, p. 16). Peay stated that he contacted the Superintendent, Deputies, and Captain of Security concerning correctional officers committing crimes, torture, and oppression against him in attempts to silence him pertaining to his claims that a detective framed him for murder. (*Id*.). Peay claimed that correctional officers had two inmates physically assault him on April 29, 2014, and that there was a "total failure to protect." (*Id*.). The Grievance Officer denied the initial grievance. (Doc. 106-1, p. 17). Peay appealed Grievance Number 507592 to the Facility Manager. (Doc. 106-1, p. 18). The Facility Manager denied Peay's appeal. (Doc. 106-1, p. 19). Peay then appealed Grievance Number 507592 to final review, and the institution's findings were ultimately upheld. (Doc. 106-1, pp. 20-21).

27

In the initial grievance, the only failure to protect claim that was properly identified is Peay's claim with respect to the April 29, 2014 altercation with inmates Reyes and Wilson. The Court finds that Peay properly exhausted his claim with respect to the April 29, 2014 altercation with inmates Reyes and Wilson as raised in Grievance Nurnber 507592 .

## C.   Personal Involvement

Individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207-08; *see also Rizzo v. Goode*, 423 U.S. 362 (1976); *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208.

Defendants argue that the evidence fails to establish that they had any involvement in the alleged herpes poisoning, the First Amendment claims, the April 29, 2014 assault, and finding Peay guilty of a misconduct for fighting. (Doc. 112, pp. 22-29). The Court will address these claims *seriatim*.

### 1. Herpes Claim

Peay alleges that unnamed staff members poisoned him with herpes "after raising staff's involvement in the 4-29-14 assault." (Doc. 17, p. 4). It is clear from the record that Peay tested negative for the herpes simplex virus. Peay failed to offer any evidence to dispute this fact, failed to name any Defendants in relation to this claim, and merely sets forth conclusory accusations that he was poisoned with herpes.[2] No reasonable juror could conclude from the evidence that any of the Defendants poisoned Peay with herpes. Rule 56 requires affirmative evidence in support of a claim. *See* FED. R. CIV. P. 56(e). The record is devoid of any such corroborative evidence. The Court will grant summary judgment to Defendants on this claim.

---

[2] Peay submitted lab results and progress notes which he claims reveal a herpes diagnosis. (Doc. 111, pp. 9-12). Peay is mistaken. The lab work submitted by Peay pertains to blood collected in April 2014, and is not a test for the herpes simplex virus. (Doc. 111, p. 9). The progress notes submitted by Peay are dated May 20, 2014, and indicate that Peay was evaluated for the herpes simplex virus after complaints of a burning sensation on his genitals. (Doc. 111, p. 10). Peay was subsequently tested for the herpes simplex virus. The conclusive test results from June 17, 2014 reveal a negative diagnosis for herpes. (Doc. 106-5, p. 14).

Peay further alleges that Defendant Henry failed to protect him from being poisoned with herpes. Peay acknowledges that he is suing Defendant Henry because he was "in charge of the housing unit" and, in this role, failed to protect him from the herpes poisoning. (Doc. 17, p. 5). Peay's claim, in essence, is nothing more than an assertion of *respondeat superior* liability which seeks to hold this Defendant liable based on his supervisory role. This ground of constitutional liability has been squarely rejected by the courts. *See Rode*, 845 F.2d at 1207. Moreover, Peay has offered no evidence to support his claim that Defendant Henry failed to protect him from the alleged herpes poisoning. Indeed, Peay has not presented any evidence that he ever tested positive for the herpes simplex virus. The Court will grant summary judgment to Defendant Henry on this claim.

### 2. First Amendment Claim

Peay alleges that unnamed staff tampered, read, and withheld his legal mail in retaliation for his claim that he is innocent of murder. (Doc. 17, p. 3). A careful review of the amended complaint confirms that Peay does not allege that any of the Defendants were personally involved in the purported mail tampering. (*See generally* Doc. 17). Moreover, Peay does not name any of the Defendants in the grievances pertaining to his mail tampering claim. (Doc. 106-1, pp. 27, 61, 68, 73). Peay failed to offer any evidence to dispute this fact. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" and cannot survive Rule 56 scrutiny by relying on

30

unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). Peay has failed to demonstrate a genuine issue of fact as to whether any of the Defendants were personally involved in this First Amendment mail tampering claim.

### 3.   *Misconduct Charge*

On April 29, 2014, correctional officer Peters issued Misconduct Number B357021 charging Peay with Fighting and Refusing to Obey an Order. (Doc. 106, ¶ 20). A hearing was held before Hearing Examiner Himes and Peay was ultimately found guilty of the charges. (Doc. 106, ¶ 25). The uncontroverted evidence reflects that the Defendants were not involved in the issuance of the misconduct charge, and were not involved in the misconduct hearing and, thus, had no personal involvement in finding Peay guilty of the charges.

On appeal, Defendants Whitesel and Fisher upheld the decision of Hearing Examiner Himes. (Doc. 106, ¶¶ 27, 29-30). Defendant Whitesel was a member of the Program Review Committee that reviewed Peay's first appeal. (Doc. 106, ¶ 27). Defendant Fisher reviewed Peay's second appeal. (Doc. 106, ¶¶ 29-30). To the extent that Peay attempts to hold Defendants Whitesel and Fisher liable based on their involvement in the review of his misconduct appeals, this claim also fails. The "failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional

31

violation." *Flanagan v. Shively*, 783 F. Supp. 922, 931-32 (M.D. Pa. 1992), *aff'd*, 980 F.2d 722 (3d Cir. 1992). Thus, insofar as Defendants Whitesel and Fisher are sued in their capacity for upholding the decision of the hearing examiner, dissatisfaction with responses to an inmate's grievances or mere concurrence in an administrative appeal process does not support a constitutional claim. *See Alexander v. Gennarini*, 144 F. App'x 924 (3d Cir. 2005) (concluding that involvement in the post-incident grievance process is not a basis for § 1983 liability); *Wilkerson v. Schafer*, 2011 WL 900994, at *7 (M.D. Pa. 2011) (allegations that defendants "should be held liable for due process violations because they should have become aware of them through their review of his misconduct appeals is insufficient to establish their personal involvement in the underlying unconstitutional conduct"); *Cole v. Sobina*, 2007 WL 4460617, at *5 (W.D. Pa. 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern."). Judgment will be entered in favor of Defendants on this claim.

### D.  Failure to Protect Claim

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners against the 'unnecessary and wanton infliction of pain" and "impose[s] a duty upon prison officials to take reasonable measures 'to protect prisoners from violence at the hands of other prisoners.'" *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (citing *Farmer v.*

*Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Whitley v. Albers*, 475 U.S. 312, 319, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986))).

"In order for a plaintiff to prove a constitutional violation in a failure-to-protect case, a claimant must demonstrate that: (1) he is 'incarcerated under conditions posing a substantial risk of serious harm;' and (2) the prison officials acted with 'deliberate indifference to his health and safety.'" *Ogden v. Mifflin County*, 2 008 U.S. Dist. LEXIS 81681, *9-10 (M.D. Pa. 2008) (citing *Farmer*, 511 U.S. at 834). A substantial risk of serious harm "may be established by much less than proof of a reign of violence and terror," but requires more than a single incident or isolated incidents. *See Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985). This does not require that an inmate must suffer an assault before obtaining relief. *Id.* Deliberate indifference requires that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Heggenmiller v. Edna Mahan Corr. Inst.*, 128 F. App'x 240, 245 (3d Cir. 2005). "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001).

Finally, the inmate must show that "the official's deliberate indifference caused the harm."

*Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).

Peay claims that Defendants failed to protect him from an assault by two inmates on

April 29, 2014 after Peay informed them that staff were "siccing" inmates on him. (Doc. 17,

p. 2). Peay failed to provide any evidence to support his claims that staff caused inmates

Reyes and Wilson to assault him. The evidence reflects that Captain Goss and Lieutenant

Booher interviewed Peay on April 30, 2014 in response to his call to the abuse hotline

regarding the April 29, 2014 incident. The interview is documented by a Grievance Officer

as follows:

> Mr. Peay, in the above grievance you claim that you have contacted staff
> concerning COs commi[t]ting crimes, torture, and oppression against you, in
> order to silence you concerning a detective "framing" you for the crime of
> murder. You claim that multiple COs have committed these actions. You
> claim that you informed the facility chaplaincy department and in retaliation,
> COs had 2 inmates assault you. Inmate Peay you were interviewed on
> 4-30-14 by Captain Goss and Lt. Booher of the security office due to you
> calling the abuse hotline about this allegation. You told them that you were
> assaulted by two inmates and believe that Sgt. K Crum put the inmates up to
> do it. You were asked what evidence you had to support this and you stated
> that is just what you thought and really do not know. The inmates that you
> were involved in the fight with state that staff were not involved in this
> altercation nor were they told to assault you by staff. After speaking with
> staff, they have informed me that they did not commit crimes of torture or
> retaliate against you. Mr. Peay, all of your claims have been previously
> investigated and you never provide any specifics. In closing, your grievance
> is denied and considered frivolous due to the fact that your claims are
> unfounded and simply no evidence exists to substantiate they happened.
> Your relief requested of $150,000.00 is also denied.

34

(Doc. 106-1, p. 17). Peay appealed the denial of this grievance to the Facility Manager.

(Doc. 106-1, p. 18). On appeal, the Facility Manager upheld the Grievance Officer's

response and found that Peay did not present any new information that would change the

outcome of the original response. (Doc. 106-1, p. 19). Peay then appealed to the SOIGA.

(Doc. 106-1, p. 20). The Chief Grievance Officer upheld the institution's findings and

responded as follows:

> A review of the record shows that you are filing an appeal based on your
> claim that on 4-29-14, Officers Crum, Reid, [and] Gerhart, had two other
> inmates jump you and assault you. You say that for over a decade, white
> staff have been trying to silence you about being framed for Murder along
> with reading your incoming and outgoing mail. You also complain that staff
> has used secret technology and microwaves to torture you which has caused
> you severe pain and sickness. You are asking to be paid $150,000 for
> deliberate indifference.
>
> An investigation into the matter reveals that there is no evidence to
> substantiate your claims. You were interviewed by the Security Office staff
> and an Investigator from the Office of Special Investigations and Intelligence.
> You were asked what evidence you had to support your allegations and you
> stated that it was just what you thought and really did not know. The inmates
> that you were involved in the fight with stated that staff were not involved in
> the altercation nor were they told to assault you by staff. Interviewed staff
> denied torturing or retaliating against you. The staff did not use[] secret
> technology or microwaves to torture you and as a result, the frivolous
> determination is upheld. Your request for payment of $150,000.00 is denied.

(Doc. 106-1, p. 21).

The DOC Office of Special Investigations and Intelligence subsequently initiated an

investigation regarding Peay's allegations that prison staff had him assaulted by inmates

35

Reyes and Wilson on April 29, 2014. (Doc. 106, ¶ 40). Once the investigation was

launched by the OSII, Lieutenant Allison interviewed Peay. (Doc. 106-2, pp. 2-4). Peay

again stated that he could not provide any evidence to support his claim that staff had

inmates Reyes and Wilson assault him. (Doc. 106-2, p. 4, ¶ 7). He merely stated that is

what he thinks happened. (*Id.*). In conjunction with this investigation, the staff and inmates

involved in the April 29, 2014 altercation were interviewed, and they all denied Peay's

allegations. (Doc. 106-2, p. 3, ¶ 7). Inmates Reyes and Wilson explained that Peay had

been coming at them for a month, they had enough, and beat him up. (Doc. 106-2, p. 3, ¶

8). Lieutenant Allison ultimately determined that Peay's allegations were unsubstantiated.

(Doc. 106-2, p. 3, ¶ 6).

Peay has not presented any evidence in support of his claims that staff failed to

protect him from assault and caused inmates Reyes and Wilson to assault him. Instead,

Peay sets forth hypothesis and accusation, which is insufficient to satisfy his burden. The

party adverse to summary judgment must raise "more than a mere scintilla of evidence in its

favor" and cannot survive Rule 56 scrutiny by relying on unsupported assertions, conclusory

allegations, or mere suspicions. *Williams*, 891 F.2d at 460. *See Betts v. New Castle Youth*

*Development Center*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams*, 891 F.2d at 460);

*Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477

U.S. at 325). Rule 56 requires affirmative evidence in support of a claim. *See* FED. R. CIV.

P. 56(e). The record is devoid of any such affirmative evidence. Accordingly, the Court will grant summary judgment to Defendants on the Eighth Amendment failure to protect claim.

### E.    Z Code Status

The Eighth Amendment protects prison inmates from cruel and unusual punishment. *See Farmer*, 511 U.S. at 832. However, not all deficiencies and inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). To assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective and subjective test. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Specifically, a prisoner must show that the alleged deprivation is "sufficiently serious" and that he has been deprived of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. A prisoner must also demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials possessed a "sufficiently culpable state of mind" and demonstrated "deliberate indifference" to his health or safety. *Id.* However, only "extreme deprivations" are sufficient to present a claim for unconstitutional conditions of confinement. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).

Peay claims that Defendants Fisher, Whitesel, and Oliver refused to remove his Z code status "so they could continue to cause [him] 'harm' (claustrophobia; etc.) from the '6 ½ years' [he] served in 'solitary confinement.'" (Doc. 17, p. 5). As to the objective prong,

37

the Court finds that the practice of single-celling inmates is not sufficiently serious to constitute denial of the minimal civilized measure of life's necessities. *See Keeling v. Barrager*, 2014 WL 1338077 (M.D. Pa. 2014) ("the United States Constitution does not confer any right upon an inmate to any particular custody or security classification") (citing *Moody v. Daggett*, 429 U.S. 78, 88, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976); *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

As to the subjective prong, Peay has not established that any Defendants were deliberately indifferent to his health or safety. Notably, Peay does not claim that he was denied basic human needs, such as food, clothing, shelter, sanitation, and medical care. Moreover, the evidence establishes that Peay's Z code status was reasonable and was based on his documented history of assaultive and combative behavior. (Doc. 106, ¶¶ 72, 76). The evidence reveals that Peay has had a Z code since 2001 due to problems with his cellmates at SCI-Graterford . (Doc. 106, ¶ 71). The evidence further reveals that Peay has had continuing problems with his cellmates and fellow inmates. For example, on December 5, 2013, Peay was transferred from SCI-Fayette to SCI-Smithfield due to his assault of another inmate. (*Id.*).

Since being placed in the custody of the Department of Corrections, and as of March 6, 2014, Peay has received 64 misconduct reports, including multiple misconducts for assault involving staff members. (*Id.*). Peay assaulted staff by punching, kicking, and

spitting on them, throwing objects and unknown liquids at them, attempting to bite them, and making other physical contact with them. (*Id.*). Additionally, Peay has received four misconducts for assaults on other inmates. (Doc. 106, ¶¶ 71, 75). The evidence further reveals that the Pennsylvania Department of Corrections does not house inmates in "solitary confinement." (Doc. 106, ¶ 83; Doc. 106-7, ¶ 6). Moreover, was housed at SCI-Smithfield from December 5, 2013 to July 10, 2014. (Doc. 106, ¶ 84). During this time, he was housed in General Population from December 12, 2013 to January 5, 2014, and again from January 22, 2014 to April 29, 2014. (*Id.*).

Peay has not presented any evidence to dispute these facts. Peay has thus failed to establish that the deprivation alleged was objectively, sufficiently serious, and that Defendants Fisher, Whitesel, and Oliver acted with deliberate indifference to an excessive risk to his health and/or safety as required by *Farmer*. Consequently, the Court will enter summary judgment in favor of Defendants Fisher, Whitesel, and Oliver with respect to Peay's claim that they refused to remove his Z code status.

### F.     Retaliation Claim

The First Amendment offers protection for a wide variety of expressive activities. *See* U.S. CONST. amend I. These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89 (1987).

Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000). To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate: (1) that he was engaged in constitutionally protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) (quoting *Allah*, 229 F.3d at 225).

Peay generally alleges that correctional officers retaliated against him and had two inmates physically assault him. (Doc. 17, p. 3). With respect to this claim, Peay failed to establish what constitutionally protected activity he was engaged in that would suffice for purposes of stating a First Amendment retaliation claim. Moreover, Peay's unsubstantiated claim that correctional officers retaliated against him is insufficient to survive the Rule 56 standard. Defendants have presented evidence providing that, in each alleged instance of retaliation, their actions were justified and were not taken in retaliation. (Doc. 106-1, p. 31). Peay has failed to provide any "affirmative evidence" in support of his right to relief. *Pappas*, 331 F. Supp. 2d at 315; FED. R. CIV. P. 56(e).

Peay further alleges that unnamed staff tampered, read, and withheld his mail in retaliation for Peay's assertion that he is innocent of murder. (Doc. 17, p. 3). This mail tampering claim involves a protected activity because prisoners have a First Amendment

40

right to send and receive mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006). However, Peay failed to establish that any of the named Defendants were involved in the alleged mishandling of his mail. Instead, he generally states that "staff" tampered with his mail. (Doc. 17, p. 3). Peay failed to set forth any plausible facts or evidence to support a claim that his mail was tampered with by any of the named Defendants. Because the Defendants were not personally involved in the purported withholding of mail, Peay cannot establish that he suffered any adverse action at the hands of the Defendants. Consequently, Defendants are entitled to an entry of summary judgment on the retaliation claim.

## G.    Qualified Immunity

Defendants raise the defense of qualified immunity in answer to Peay's § 1983 claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It "provides ample protection to all but the plainly incompetent or those who knowingly violate

41

the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official

reasonably believes that his conduct complies with the law, qualified immunity will shield

that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing

Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that

should be considered at the earliest possible stage of proceedings, a genuine dispute of

material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571

F.3d 318, 325-26 (3d Cir. 2009).

    A court evaluating a claim of qualified immunity considers two distinct inquiries: first,

whether, based on the facts alleged, a constitutional right has been violated and, second, if

so, whether the right was "clearly established" at the time of the alleged violation. *Spady v.

Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Pearson*, 555 U.S. at

232). A court may begin its qualified immunity analysis with either prong. *See Pearson*,

555 U.S. at 237. Because there are no genuine issues of fact as to whether a constitutional

or federal right has been violated, Defendants are entitled to qualified immunity. *See, e.g.,

Milhouse v. Gee*, 2011 U.S. Dist. LEXIS 91749, *24-27 (M.D. Pa. 2011) (granting the

defendants' motion for summary judgment because the plaintiff "failed to set forth an Eighth

Amendment claim with respect to this use of force incident . . . and qualified immunity

shields Defendants from suit").

## IV.    Conclusion

For the reasons set forth above, the Court will grant Defendants' motion (Doc. 105)

for summary judgment.  A separate Order shall issue.

Date: March 24, 2017

Robert D. Mariani
United States District Judge

43